

FILED
JUN - 4 2009

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

FRED A. BARNES,                         )
                                        )
               Plaintiff,               )      Civil Case No. 04-1203-KI
                                        )
    vs.                                 )      OPINION AND ORDER
                                        )
UNUM LIFE INSURANCE COMPANY             )
OF AMERICA,                             )
                                        )
               Defendant.               )
_____ )

Megan E. Glor
621 SW Morrison Street, Suite 900
Portland, Oregon 97205

    Attorney for Plaintiff

William T. Patton
Lane Powell PC
601 SW Second Avenue, Suite 2100
Portland, Oregon 97204-3158

    Attorney for Defendant

Page 1 - OPINION AND ORDER

KING, Judge:

Plaintiff Fred Barnes seeks to recover disability benefits from defendant Unum Life Insurance Company of America ("Unum"). Before the court is plaintiff's Motion for Summary Judgment (#47) and defendant's Motion for Summary Judgment (#58).

Plaintiff asserts he is entitled to Long Term Disability ("LTD") benefits from March 29, 2002, the date his benefits were due but not paid, through the date of judgment, and that he is entitled to continue to receive a monthly LTD benefit so long as he remains disabled.

For the following reasons, I deny plaintiff's motion and grant defendant's motion.

## FACTUAL BACKGROUND

Plaintiff was employed by Leed Electric, Inc. ("Leed") and is a beneficiary under the NECA Members' Group Long Term Disability Plan (the "Plan"),[1] a policy insured by Unum.

Plaintiff was diagnosed in 1999 with liposarcoma, a cancer of deep soft tissue, of the right thigh. Plaintiff underwent a surgical resection, radiation therapy and chemotherapy. He continued to work during this time.

Plaintiff stopped working at Leed on May 1, 2001. By this time, he was the vice president of the company. Leed paid plaintiff sick pay until December 28, 2001. At some point in 2001, plaintiff moved to Grants Pass. He may have moved as early as February 2001 because, in a clinic note at that time, one of plaintiff's doctors indicated that plaintiff "is to followup with a primary care physician down closer to home in Grants Pass." Decl. of Megan Glor, Ex. B at 23 (hereinafter, "Ex. B"). In any event, plaintiff had moved to Grants Pass by July 2001. He asserts

---

[1] This was later replaced by the National Association Executives Forum, Inc. Benefits Program.

Page 2 - OPINION AND ORDER

it was not a permanent move until the fall of 2001. Darlene Duran, in charge of payroll at Leed, stated that plaintiff attempted to return to work in August 2001 but that he was unable to finish the estimates or concentrate on his work because of his medical problems. Plaintiff says he moved so that his wife and children could be close to family if he did not recover and so that the family could care for his ill father-in-law.

Plaintiff assumed ownership of his father-in-law's auto parts business in Grants Pass. He stated he has never been an employee of the business, but that he was an investor and that he worked approximately ten hours per month securing financing and signing documents. There is evidence he worked more hours than he reported. In the summer of 2002, for example, he told Susan Wrona-Sexton, the psychiatric mental health nurse practitioner who treated plaintiff, that he was "beginning to engage in his old habits of getting deeply into the business and working excess hours" and that he was busy with the business which is why he had not completed disability papers. Id. at 197, 222. They discussed his going to work later or taking time off in the afternoon and closing the business on Sundays so that he would have a day to himself. Id. at 256. In October, plaintiff informed Wrona-Sexton that the business had hired another person so he could decrease the "excessive time he needs to be there." Id. at 259.

Plaintiff applied for LTD benefits under the Plan on April 23, 2002, alleging that he had been unable to work due to liposarcoma. The Plan defines a disability as follows: "You are disabled when Unum determines that: you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury." Decl. of Megan Glor, Ex. A at 15 (bold in original) (hereinafter, "Ex. A").

Page 3 - OPINION AND ORDER

Once LTD benefits have been paid for 24 months, the insured is entitled to benefits if he is unable to "perform the duties of any **gainful occupation**" for which he is "reasonably fitted by education, training or experience." Id. at 15. "Gainful occupation" is defined, in relevant part, to be "an occupation that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds 60% of your indexed monthly earnings . . . ." Id. at 38.

In a telephone call with Unum on May 31, 2002, plaintiff described his disabling condition as an inability to climb or handle rough terrain and stairs; he explained that he had stopped working in the fall of 2001. He also informed Unum that no doctor had suggested he stop working.

On July 31, 2002, Unum notified plaintiff by telephone and letter that it had denied his claim, but that he could appeal within 180 days of the date he received the denial letter. Unum did not send the letter by any means that could be tracked and plaintiff does not remember when he received the letter.

Plaintiff also applied for a waiver of his life insurance premium, which Unum denied on August 8, 2002.

Plaintiff appealed both decisions (denial of LTD benefits and denial of application for waiver of life insurance premium) on February 7, 2003. His appeal of the LTD benefits denial was submitted 191 days after Unum sent its denial letter to plaintiff. Unum notified plaintiff in a letter dated March 28, 2003 that this appeal was untimely. Plaintiff also appealed Unum's denial of his waiver of life insurance premium claim and that appeal was timely. Unum evaluated that claim on the merits and upheld the denial.

Plaintiff asked for reconsideration of the LTD benefits claim denial on September 2, 2003. On September 16, 2003, Unum explained that "[i]n calculating the time in which to appeal a decision, we add an additional ten days, which is [a] sufficient amount of time for an Insured to receive correspondence. . . . [T]he appeal was received more than 190 days from the letter dated July 31, 2002, which is beyond the allotted timeframe. [W]e are upholding our prior decision to deny reconsideration of Mr. Barnes' [LTD] claim." Ex. B at 394.

In November 2003, Unum entered into a Regulatory Settlement Agreement ("RSA") with the Department of Labor. Pursuant to the terms of the RSA, Unum offered to reassess plaintiff's claim and plaintiff accepted that offer. Unum reviewed plaintiff's entire file.

During the reassessment pursuant to the RSA, the instant action was stayed.

On July 13, 2007, Unum denied plaintiff's claim. Unum explained that, "in order to be eligible for coverage, an employee must be actively at work and working a minimum of 30 hours per week. As Mr. Barnes stopped working at Leed Electric on 5/1/01, he would no longer be considered an active employee and his coverage would end at that time, unless he is considered disabled under the policy." Id. at 986.

The remainder of the denial letter reads in pertinent part as follows:

> Mr. Barnes would have to be considered disabled as of 5/1/01 in order to be eligible for benefits. A review of the medical records has demonstrated that, subsequent to his surgery for liposarcoma in 1999, Mr. Barnes continued to be active and continued to function in his capacity as Manager/Estimator/Vice President at Leed Electric. He subsequently took himself out of work on 5/1/01 without certification of disability by a physician. There is no medical documentation of any treatment or any change in his condition at that time. The office visit note from Dr. Vetto on 1/16/01 and the subsequent visit on 7/10/01 show no indication of any worsening in his condition and no documented concerns regarding his ability to work. It is also noted that during that same time frame, Mr. Barnes moved to Grants Pass and took over a failing auto parts

> business. As noted above, while Mr. Barnes has indicated that his involvement in the auto parts business was limited to helping his wife oversee the operation of the business, the evidence indicates that he was heavily involved and working excessive hours.
>
> While we agree that reasonable (physical) restrictions and limitations, as of the date of Mr. Barnes [sic] surgery in 6/99 might include those as noted by Dr. Kohler and the SSA, it is also apparent that Mr. Barnes continued to function in his role at Leed Electric subsequent to his surgery in 1999 through the time he phased himself out of work on 5/1/01. It appears that Mr. Barnes' decision to stop working at Leed Electric and move to Grants Pass to take over his father-in-law's business was a personal choice on his part and not due to any medical impairment. Mr. Barnes has not provided proof of disability, as of 5/1/01, as there is no doctor certifying his disability and there is no medical documentation to suggest that there was a worsening in his condition at that time.

Id. at 988.

## LEGAL STANDARDS

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In ERISA actions, however, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." Bendixen v. Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999).

"ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989) (internal quotation and citation omitted). When a denial of benefits is challenged under ERISA's 29 U.S.C. § 1132(a)(1)(B), the court's review of the administrator's decision is de novo unless the plan unambiguously confers discretion on the administrator to determine eligibility for benefits or to construe the terms of the plan. If the plan

Page 6 - OPINION AND ORDER

confers discretion on the administrator, the court reviews the decision for an abuse of discretion and can only set aside the discretionary determination if it is arbitrary and capricious.[2] Since the Plan provides that the plan administrator has discretion to construe and interpret the terms of the Plan, Unum's decision is reviewed under the abuse of discretion standard.

The abuse of discretion standard applies even if the administrator has a conflict of interest, such as when the same company is both the decision-maker and the payor. Metropolitan Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2348 (Jun. 19, 2008); Abatie, 458 F.3d at 967. Similarly, minor procedural irregularities do not shift the standard of review from abuse of discretion to de novo. Abatie, 458 F.3d at 972. Rather, pursuant to Abatie, the court should use the abuse of discretion standard and "tailor its review to all the circumstances before it," rendering the conflict of interest and minor procedural irregularities as factors to consider. Id. at 968. The conflict will weigh more heavily against the insurer where "circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." Glenn, 128 S. Ct. at 2351.

## DISCUSSION

I. <u>Level of Scrutiny</u>

Plaintiff argues that Unum was influenced to deny his claim by its financial stake and that, as a result, the court should more carefully scrutinize Unum's decision under an arbitrary

---

[2] The Ninth Circuit has noted that the standards of "arbitrary and capricious" and "abuse of discretion" differ in name only. Atwood v. Newmont Gold Co., Inc., 45 F.3d 1317, 1321 n.1 (9th Cir. 1995), <u>overruled on other grounds by</u> Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955 (9th Cir. 2006) (en banc).

Page 7 - OPINION AND ORDER

and capricious review approaching de novo review. He asserts that the influence is apparent in the following three ways:

  A. <u>Unum Ignored Its Own Vocational Expert's Conclusion</u>

Plaintiff argues Unum's "most egregious act" is its inexplicable failure to consider its own vocational expert's opinion that plaintiff could not work.

Unum's Vocational Rehabilitation Consultant Richard Byard, JD, MS, CRC, Sr., evaluated plaintiff's file on July 6, 2007. He reviewed the occupational information provided to him by Unum and plaintiff and concluded that "[b]ased on the available information, it is reasonable to conclude that the physical demands of the claimant's own occupation would exceed his level of physical work capacity as described in the stated [Restrictions and Limitations ("R&L's")]." Ex. B at 956. He also stated,

> Based on the claimant's prior training, education, and experience, his narrowly focused employment history within the electrical contracting field, his stated R&L's, and his relatively high gainful wage threshold, I am unable to identify any suitable and gainful alternative occupations for this claimant based on an assessment of his physical capacities.

<u>Id.</u> at 957.

Unum responds that it simply chose to accept one opinion over another and it is not required to explain why. See <u>Jordan v. Northrop Grumman Corp. Welfare Benefit Plan</u>, 370 F.3d 869, 879 (9th Cir. 2004) (courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation"). Rather than credit the vocational expert, Unum asserts it (i) credited the opinions of seven medical consultants; (ii) considered plaintiff's own actions in working for the auto parts store after ceasing work at Leed; and (iii) evaluated statements from plaintiff's own providers

Page 8 - OPINION AND ORDER

indicating that plaintiff's medical situation was improving and that he was working excessive hours at the auto parts store.

Unum is generally correct in its assertion that it need not explain why it accepted reliable evidence over conflicting evidence. Here, however, as plaintiff notes, Byard was the only consultant to consider plaintiff's medical record in the context of the Plan's disability definition and no expert gave a conflicting opinion. While courts may not require an explanation when plan administrators accept evidence that conflicts with information submitted by the claimant, at the same time "[p]lan administrators may not arbitrarily refuse to credit a claimant's reliable evidence" when there is no evidence to the contrary. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). It is particularly troubling that Byard was an expert hired by Unum and yet nowhere in its decision does Unum explain why it rejected Byard's conclusion. Unum's failure to provide this explanation is sufficient to cause me to conclude that the structural conflict of interest may have affected Unum's evaluation. As a result, I impose a more stringent standard of review.

B.   Unum Initially Refused to Review Plaintiff's Appeal

Plaintiff also argues Unum's conclusion that plaintiff's appeal was late was unreasonable and is a reflection of how the structural conflict affected Unum's approach to plaintiff's claim. Unum informed plaintiff that his appeal was due within 180 days of the date he received the denial letter. It, however, did not track its initial denial letter and does not know when the 180-day clock began ticking. Instead, Unum allowed for a ten day mailing window, thereby allowing the appeal to be filed within 190 days.

I agree with Unum that its deadline for plaintiff's appeal was not unreasonable. Unum notified plaintiff of the 180-day deadline and plaintiff's appeal was late even when providing him ten extra days for mailing. In concluding that a heightened moderate level of review is required here, I do not consider as a factor the denial due to an untimely appeal.

C.     <u>Unum Relied on Duran's Statements about Plaintiff's Job Duties</u>

Plaintiff asserts Unum ignored plaintiff's own descriptions of his job duties, ignored Duran's initial statements about plaintiff's job duties, and instead relied on statements Duran made by telephone much later. He argues that Unum's choice to rely on Duran's later statements demonstrates that it was influenced by its conflict of interest. Additionally, plaintiff suggests that Unum improperly ignored its plan language, which required it to evaluate plaintiff's job duties as they are "performed in the national economy" and not how they are performed by a particular employee. Ex. A at 40.

Plaintiff reported on May 31, 2002 that he worked approximately half of his time on electrical work, which required that he bend, squat and climb, while he spent the other half managing projects and providing estimates. When he was managing projects and estimating, he spent about 15 percent of his time in the field and 85 percent at his desk. Plaintiff provided further explanation of the breakdown of his duties in support of his appeal submitted February 5, 2003. Similarly, in his Social Security Work History Report, plaintiff reported he walked and stood several hours a day, and knelt, crouched, crawled, and handled objects about 15 to 30 minutes a day. This description is consistent with the information he gave his providers. Ex. B at 21 (John Vetto, M.D., noted plaintiff "walks vigorously for his jobs, which involve site

inspections."); id. at 35 (Susan Kohler, M.D., noted that plaintiff told her he had to climb high buildings, 200 feet above the ground, and that after the surgery he felt less comfortable doing so).

Additionally, Duran, who was not plaintiff's direct supervisor, initially informed Unum on May 7, 2002, that plaintiff worked as a manager/estimator/vice president. She reported that he estimates new jobs, visits job sites, and meets general contractors. Several months later, Unum's vocational consultant, Bruce Hoffman, called Duran to ask about plaintiff's job duties. At that time, Duran reported plaintiff spent 80 to 90 percent of his day in the office and did no installations himself. From this description, Hoffman concluded that plaintiff's job was sedentary. Plaintiff argues that Unum's failure to investigate the discrepancy between Duran's later description and her earlier description, and the conflict between Duran's later statement and plaintiff's statements, is indicative of how Unum was influenced by its conflict.

Contrary to plaintiff's reading, Unum's denial was premised on the fact that there was no evidence that plaintiff was unable to work as of May 1, 2001. Indeed, whether plaintiff performed the job as he described it, as Duran described it, or as it was performed in the national economy, Unum was focused on the fact that plaintiff could and did perform his job despite his liposarcoma and that he stopped working of his own volition and not due to any obvious change in his condition. As a result, I do not consider this as a factor in identifying the appropriate standard of review.

///


///

D. <u>Conclusion</u>

Although there is no evidence of malice, poor history of claims investigation,[3] or self-dealing, there is some evidence Unum was influenced by its conflict of interest to deny plaintiff's claim. While Unum's initial denial of the appeal for being late is not egregious and Unum did not rely on Duran's description of plaintiff's job duties in denying plaintiff's claim, it is disconcerting that Unum ignored its own vocational expert's opinion that plaintiff met the definition of disability under the Plan. Although it is true it need not rely on the opinion, when there is no conflicting evidence it ought to explain its rationale in rejecting the evidence. Its failure to do so is sufficient to suggest that Unum may have been persuaded by its bottom line to deny plaintiff's claim.

As a result, I have decided to apply a moderate level of scrutiny. I am guided by the principles that "[a]n administrator's decision is an abuse of discretion when it is without reason, unsupported by substantial evidence or erroneous as a matter of law. . . . [T]he focus of an abuse of discretion inquiry is the administrator's analysis of the administrative record–it is not an inquiry into the underlying facts." <u>Torres v. Reliance Standard Life Ins. Co.</u>, 551 F. Supp. 2d 1221, 1233 (D. Or. 2008) (internal citations omitted), <u>rev'd on other grounds</u>, 2009 WL 725938 (9th Cir. Mar. 16, 2009). However, because a somewhat higher level of inquiry is required, I will closely review Unum's decision.

---

[3] At the hearing on these motions, plaintiff argued that Unum's claims administration is relevant in assessing the standard of review. Plaintiff failed to raise the argument in any of the many briefs. Furthermore, there is no evidence in the record as to the reason for the reassessment. I do not consider Unum's history of claims administration as a factor.

II.     Evaluation of the Evidence

Both parties agree that plaintiff must be disabled as of May 1, 2001 in order to be entitled to benefits. The question is whether Unum abused its discretion in finding plaintiff not disabled as of that date.

Plaintiff argues that Unum unreasonably focused on plaintiff's ability to work during and after cancer treatment when plaintiff is a hard worker who continued to work despite his disability. The evidence is clear that plaintiff is the type of person who "finds unemployment emotionally painful" and who does not "shirk from work and responsibility." Ex. B at 275, 670, 270. As plaintiff points out, "A desperate person might force himself to work despite an illness that everyone agreed was totally disabling. . . . A disabled person should not be punished for heroic efforts to work by being held to have forfeited his entitlement to disability benefits should he stop working." Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 918 (7th Cir. 2003).

If Unum denied plaintiff's claim solely because he continued to work, I would agree with plaintiff. Here, however, Unum reasonably concluded that the medical evidence at the relevant time also did not support a finding that plaintiff's condition was disabling. In January 2000, Dr. Vetto noted,

> The patient feels well. He managed to work all the way through his radiation and chemotherapy without missing any significant amount of time. He notes that he has some weakness and flexion when attempting to cross his leg but otherwise has full range of motion and **no major complaints. The operation does not appear to be interfering with his work or lifestyle; although, the patient is anxious to go back [to] more rigorous exercise program.**

Page 13 - OPINION AND ORDER

Ex. B at 7-8 (emphasis added). Four months before plaintiff left Leed, Dr. Vetto stated in a chart note of January 16, 2001,

> The patient has no new complaints today except for some tightness in the lateral portion of the right thigh which he has noticed since becoming more active. The patient walks vigorously for his jobs, which involve site inspections. **The patient says the tightness is not that particularly troubling** and is wondering if it is advisable to start some stretching exercises.

Id. at 20 (emphasis added).

One month later, plaintiff saw John Holland, M.D., who commented plaintiff was "doing well." Id. at 23.

Plaintiff did not seek treatment for his thigh in March, April, May or June, 2001.

Plaintiff did not see Dr. Vetto again until July 10 when Dr. Vetto noted plaintiff's "leg cramps have become dramatically better after he was put on quinine by a local provider," and that plaintiff's problems "have not worsened of late and have actually improved." Id. at 29. At the same time, Tonya Enomoto, M.D., a resident working with Dr. Vetto, recorded that plaintiff experiences tightness and cramping when he exercises and that since the "patient is involved in construction, this is **somewhat inhibiting** while he is at work." Id. at 30-31 (emphasis added).

On July 19, Susan Kohler, M.D., noted that plaintiff takes quinine and cyclobenzaprine at night for his leg cramps, and in September she commented that plaintiff "has been doing well." Id. at 39. Also at that time, Dr. Kohler explained that plaintiff reported "some continued discomfort in this right thigh, but notes more now that he is having left knee pain, probably from changes in his gait. He has stopped taking quinine and is actually taking Flexeril, both for sleep and for muscle spasm, and this seems to be working quite nicely. He has had no febrile symptoms." Id.

Page 14 - OPINION AND ORDER

In October, plaintiff complained of fatigue, insomnia and knee pain to Christopher Alftine, M.D., who noted "no weakness or rigidity" with plaintiff's "strength and tone," and "no instability" with regard to his "gait and station." Id. at 43.

Plaintiff interprets these treatment records as providing objective evidence of plaintiff's disability and explains that he does not complain, which is why the records do not reflect how the surgery affected him. Plaintiff's interpretation of the evidence may be reasonable, but so is Unum's. See Torres, 551 F. Supp. 2d at 1234 (considered whether reasonable basis for defendants' conclusion under moderate level of scrutiny). Unum reasonably found that neither plaintiff nor his treating physicians indicated that plaintiff's right leg was unstable or that he was unable to perform his duties at work because of his liposarcoma.

Furthermore, Unum properly considered plaintiff's heavy involvement in his father-in-law's auto parts store after leaving Leed. According to the record, plaintiff was "working excess hours," had "been busy [with] his G.P. business," needed to "step back from his intense workload," and needed to decrease "the excessive time he needs to be" at business. Ex. B at 197, 222, 256, 259. This high level of activity is inconsistent with the notion that plaintiff finally left Leed in May 2001 because he simply could not bear the pain any longer, even though objectively his condition had not worsened.

Unum also points out that seven different medical consultants reviewed plaintiff's file and came to the same conclusion that plaintiff was not disabled. While plaintiff is correct that two of those opinions were short and somewhat superficial in their analyses, and that Unum's experts did not talk with plaintiff or any of his treating providers and did not examine plaintiff, the opinions support Unum's reading of plaintiff's medical records.

Page 15 - OPINION AND ORDER

Specifically, Bethany Washburn, RN, summarized the medical record at length and concluded that plaintiff has "demonstrated capacity since [his diagnosis and treatment] and medicals indicate that his condition has actually improved." Id. at 208. Brian Brock, D.O. found, in a short report, that "the records do not indicate physician documented worsening of the clmt's condition." Id. at 208.

Maureen Lee, D.O., an in-house osteopathic physician, reviewed plaintiff's file and mentioned that plaintiff's doctors were not concerned about plaintiff's continuing to work, that they recommended mild treatment, and that plaintiff did not seek care for his leg frequently. Dr. Lee pointed out that plaintiff's doctors did not refer him to physical therapy, did not recommend compression stockings, did not recommend pain medication or any alteration in pain medications, and did not refer plaintiff back to his orthopedic specialist. Robert Keller, M.D., another in-house physician, signed off on Dr. Lee's conclusion without providing any analysis of his own.

Similarly, Stewart Russell, D.O., commented that no doctor had imposed functional limitations on plaintiff and that plaintiff had not reported worsening symptoms until April of 2002.

With regard to plaintiff's psychological state, Carlyle Voss, M.D., a psychiatric consultant for Unum, opined, "The available information does not support the presence of psychiatric symptoms or related R/Ls, which preclude Mr. Barnes [sic] participation in his former occupation." Id. at 322. Similarly, Michelle Schwab, PhD, a clinical psychologist consultant, concluded, "The insured was able to move to another state, wind down his involvement in one business, and start up involvement in a new business. There is simply not

evidence of a significant mental disorder that renders him <u>unable</u> to work from a psychological perspective." Id. at 746 (emphasis in original).

It is clear plaintiff's condition worsened in late 2002 and early 2003. The relevant period at issue, however, is May 2001. Accordingly, Dr. Alftine's diagnosis of depression a year later in 2002 and of fibromyalgia in 2003 are irrelevant to Unum's evaluation of the evidence. Similarly, treatment by Rudy Greene, M.D., for diffuse arthralgias and myalgias, severe fatigue and insomnia in 2005 is immaterial. Finally, Susan Wrona-Sexton's treatment of plaintiff for depression in July 2002 through February 2005 has no bearing on Unum's decision.

As I noted above, Unum's failure to explain its rejection of its own vocational expert's opinion is troubling. Nevertheless, given that evidence in the record supports Unum's conclusion that plaintiff was not disabled, and the fact that Unum was not required to accept the vocational expert's opinion, the lack of explanation is not sufficient to render Unum's decision arbitrary and capricious. Cf. Gaither v. Aetna Life Ins. Co., 394 F.3d 792, 807 (10th Cir. 2004) (insurers "cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and **when they have little or no evidence in the record to refute that theory.**") (emphasis added)).

Finally, plaintiff takes issue with Unum's failure to accept the decision made by the Social Security ALJ, who concluded plaintiff was incapable of performing his past work. Unum was not arbitrary and capricious in ignoring the ALJ's October 2005 decision because the ALJ did not establish a date of onset for the restrictions and limitations.

Additionally, Unum was not arbitrary and capricious in relying on the evidence plaintiff submitted in support of his application for Social Security disability. There is no indication Unum ignored evidence benefitting plaintiff in favor of evidence that undermined his claim.

## CONCLUSION

Based on the foregoing, I deny plaintiff's Motion for Summary Judgment (#47) and grant defendant's Motion for Summary Judgment (#58).

IT IS SO ORDERED.

Dated this _____3rd_____ day of June, 2009.

_____
Garr M. King
United States District Judge